### CITY OF NEW YORK v. McCARTHY.

(Supreme Court, Appellate Division, First Department. March 3, 1916.)

1. WHARVES ⊙⇒9—LEASE—CONSTRUCTION—DUTIES OF TENANT TO REPAIR.
    Where the tenant agreed to "put, keep, and maintain wharf property * * * in good and sufficient repair and condition, and that all such repairs should be done at" the tenant's expense, the tenant's duty to repair the wharf was absolute and unqualified, and was not limited to such repairs as could be easily made, but required all necessary repairs, and the delivery of the wharf to the lessor, at the end of the term, in a complete usable form.

    [Ed. Note.—For other cases, see Wharves, Cent. Dig. §§ 4, 5; Dec. Dig. ⊙⇒9.]

2. WHARVES ⊙⇒9—LEASE—CONSTRUCTION—DUTIES OF TENANT TO REPAIR.
    In such case, the measure of damages was not the amount expended by the landlord in reconstructing the wharf, since it was immaterial whether the wharf was reconstructed at all; but the measure was the difference in value of the pier at the time the tenant entered into possession and at the time he surrendered possession.

    [Ed. Note.—For other cases, see Wharves, Cent. Dig. §§ 4, 5; Dec. Dig. ⊙⇒9.]

    Laughlin and McLaughlin, JJ., dissenting in part.

Appeal from Trial Term, New York County.

Action by the City of New York against John A. McCarthy. From a judgment for defendant, and an order denying a motion for a new trial, plaintiff appeals. Reversed, and new trial ordered.

Argued before CLARKE, P. J., and McLAUGHLIN, LAUGH-LIN, SCOTT, and PAGE, JJ.

John F. O'Brien, of New York City (Terence Farley, of New York City, on the brief), for appellant.

Jeremiah T. Mahoney, of New York City (Robert F. Wagner, of New York City, on the brief), for respondent.

SCOTT, J. [1] I agree with Mr. Justice LAUGHLIN that the case was tried upon an entirely erroneous theory as to the measure of defendant's liability, and that there must be a new trial. I do not agree with him, however, that under the terms of the lease in question the burden lay on the landlord to show what part of the necessary repairs the tenant should have made, but did not. That rule may be proper enough in the case of a lease, where the tenant's obligation goes no further than that he will "quit and surrender the premises in as good state and condition as reasonable use and wear thereof will permit," because in such a case a certain amount of deterioration is plainly contemplated as a matter for which the tenant is not to be liable.

Nothing of the sort appears in the lease, which we are now considering. The tenant's obligation is absolute and unqualified. He is required to—

"put, keep, and maintain the said wharf property, and every part thereof, and the structures thereon, or to be erected thereon, or any structures to be erected under the provisions of this lease, in good and sufficient repair and condition, and that all such repairs during said term shall be done at" the tenant's sole cost, charge, and expense.

It is not easy to see how more plain and comprehensive language could have been used, or where there is room for differentiating between repairs which the tenant should have made and those which he was not called upon to make. Certainly I can find nothing in the terms of the lease to limit the tenant's obligation to the surface and exterior of the pier and those parts which he could conveniently reach and repair. The pier was built in 1890, and from that time until 1911 the defendant was the sole tenant, holding part of the time by written leases and part of the time without such leases. His rental was apparently very moderate, and it is not unreasonable to hold that the parties intended, as the language of the lease reads, that defendant should maintain the whole pier in good condition, making from time to time such repairs, and even replacements, as would keep the pier and every part of it "in good and sufficient repair and condition," so that at the end of the term the city should receive back a usable pier, and not a wreck, which required nearly as much to put it in good condition as it originally cost to build. That this was the purpose with which the lease was made appears very clearly from the provision:

"That if by reason of total or partial destruction through fire, floating ice, collision, or the action of the elements the wharf property hereinbefore described shall require to be rebuilt, the same shall be so rebuilt, under the direction of the board of docks, in like manner and similar to the wharf property destroyed by and at the expense of the" tenant.

Here the defendant agreed to rebuild the whole pier, if necessary, if destroyed by certain causes, for none of which he could be held responsible. The purpose was, of course, that at the end of the term the city should receive back a completed and usable pier constructed according to its plans. It seems to me to be unreasonable to hold that it was intended to compel defendant to rebuild, if the pier was destroyed wholly or in part by causes which he could not control, and to exonerate him from liability for a partial destruction resulting solely from his failure to comply with his covenant to "put, keep, and maintain the said wharf property and *every part* thereof" in good and sufficient repair and condition.

As it seems to me, the defendant's liability was established when it was shown that, at the expiration of the lease, the pier was not in "good and sufficient repair and condition." That fact proved that he had not complied with his agreement to put, keep, and maintain it in the specified repair and condition, and left nothing to be determined, except the extent of the necessary repairs and their fair cost. I see no room for a distinction between "repairing" and "rebuilding," under the terms of the lease, and in view of the condition of the pier as defendant left it.

For these reasons, I concur in the reversal of the judgment appealed from and the ordering of a new trial.

CLARKE, P. J., and PAGE, J., concur.

LAUGHLIN, J. This is an action to recover damages for breaches of covenants with respect to repairing Rivington street pier, No. 50, on the East River, contained in a lease in writing between the parties, made on the 15th day of November, 1901, by which the plaintiff leased to the defendant the pier and the bulkhead between it and the Rivington street pier north, No. 51, together with the new-made land in the rear of the bulkhead under the jurisdiction of the department of docks and ferries, for the period of 10 years from the 1st day of December, 1901, for the annual rental of $2,100. There is no recital in the lease with respect to the condition of the pier at the time the lease was made; nor does the lease contain the usual provision excepting ordinary wear and damage by the elements from the obligations of the tenant to make repairs. The tenant covenanted to—

"put, keep, and maintain the said wharf property and every part thereof, and the structures thereon, or to be erected thereon, or any structures erected under the provisions of this lease, in good and sufficient repair and condition, and that all such repairs during said term shall be done at" his sole cost, charge, and expense.

In the next succeeding paragraph, the tenant covenants:

"That he will not at any time make any claim that the said wharf property is not, or was not at the time of the commencement of said term, in suitable repair or condition for the uses and purposes of this lease."

It is further expressly provided that if the tenant should make default, and should neglect or refuse to make repairs as covenanted by him, for the period of 10 days after notice, then the lease should be

null and void, and the tenant would pay such damages as the land-
lord may have sustained, or at its option it might make the repairs
and the tenant would pay the full cost and expense thereof on de-
mand, and should have no claim for reduction of rent on account there-
of; and it was mutually agreed:

"That if by reason of total or partial destruction, through fire, floating ice,
collision, or the action of the elements, the wharf property hereinbefore
described shall require to be rebuilt, the same shall be so rebuilt under the
direction of the board of docks, in like manner and similar to the wharf
property destroyed, by and at the expense of the" tenant "and in accordance
with plans and specifications submitted to and approved by the board of
docks."

In the event of the failure of the tenant "to perform, keep, do, or
observe any or either of the covenants, agreements, promises, things,
terms, or conditions herein contained on" his part, it was expressly
provided that the landlord, by resolution of the board of docks, might
in its discretion terminate the lease. The tenant covenanted and agreed
that at the termination of the lease as therein provided, or at the ex-
piration of the term, the wharf property and structures "shall then
be well and sufficiently repaired and in good order and condition." At
the expiration of the period for which the lease was given the tenant
surrendered possession.

This was an unshedded pier about 240 feet in length. The deck of
the pier was about 5 feet above mean high water and about 9 feet
above mean low water, and consisted of planking, known as "sheath-
ing," 3 inches in thickness and 12 inches in width, bordered by a row
of timbers, known as "backing logs" 12 by 12 inches, and iron mooring
posts were placed at intervals along either side for the mooring of
vessels. It was used for unloading and loading freight, which was
hauled to and from the pier by hundreds of trucks daily, carrying six
or seven ton loads. After the tenant surrendered possession, similar
use was continued under the supervision of the department of docks
until the month of October, 1912, when it was fenced off preparatory
to reconstructing the pier under a contract which the city let to the
New York Submarine Contracting Company, and the performance of
that contract work occupied the period from October 6, 1912, until
January 6 or 8, 1913.

The pier was built in the year 1888 at a cost of $16,049. Its width
was not shown. About 200 supporting piles, about 60 feet long, were
driven into the earth 4 or 5 feet apart in rows parallel with the shore
and about 10 feet apart. On the piles along the outer edge of the
pier on either side were placed yellow pine timbers 12 by 12 inches,
known as "side caps," and on these were placed timbers of the same
material and dimensions, running crosswise of the pier, known as
"cross-caps," and on the cross-caps were place timbers of the same ma-
terial and dimensions, running lengthwise of the pier, known as "rang-
ers," some in single and some in double rows, forming nine rows in
all, which constituted practically the floor beams of the pier. On the
rangers yellow pine planking 4 inches by 8 inches, known as "deck-
ing," was laid crosswise of the pier and 2 or 3 inches apart, except-
ing where laid over "chocking," where they were closer; and on this

was laid the "sheathing" which has been described. What is known as "vertical sheathing" was placed on the outer end of the pier, and consisted of 5 by 10 inch timbers attached to the end of the pier in an upright position. In the construction of the pier "bracing" piles were used, and there was also bracing known as "A" bracing and "horizontal" bracing on the supporting piles, and bracing or wedging, known as "chocks" or "chocking," consisting of short timbers placed between the rangers and between the fender piles and under the mooring posts to strengthen their support. When the pier was originally built, oak timbers 8 inches by 12 inches and 14 feet long were attached to the outer ends of each row of piles at the sides of the pier, extending from the top of the backing logs down to about 2 feet under water, to serve as fenders; but at some time prior to the reconstruction work under said contract additional piles were substituted for the oak timbers for fenders.

From the time the pier was constructed until the year 1890 the city maintained a dump on it. In the year 1890, the pier was leased to the defendant for 5 years, and it was leased to him again in 1897 for 3 years, the term expiring in April, 1900; but he continued to use it with the general public until the lease in question was made, and he testified that during this period, from the expiration of his former lease until the making of the present lease, no repairs were made, and that he was under no obligation to make any.

The evidence shows that the life of sheathing is from 1 to 4 years, decking from 10 to 12 years, backing logs from 8 to 10 years, vertical sheathing 10 years, chocks on mooring posts 20 years, supporting and bracing piles from 15 to 25 years, side caps 20 years, ends of cross-caps 15 years, bracing 20 years, and rangers from 20 to 25 years. The further evidence presented by the plaintiff with respect to the condition of the pier relates to its condition in October, 1911, upwards of a month prior to the expiration of the lease, and to its condition when it was closed for repairs some 10 months after the expiration of the lease.

The plaintiff showed that the total cost of reconstruction was $12,-033, and it claimed the right to recover the entire cost of the work which substantially constituted a rebuilding or reconstruction of the pier, for according to the testimony of a civil engineer in the department of docks the pier "was stripped of everything practically down to the tops of the cross-caps," and the fender system, the chocks under the mooring posts, part of the cross-caps, and all of the piles, with the exception of 75 supporting piles and 6 or 7 bracing piles, were removed, and the piles not removed were spliced. The testimony of this witness further tends to show that, owing to the worn and decayed condition of the material removed, only a small percentage of it was suitable for use in the reconstruction of the pier. In the reconstruction of the pier, the pile fender system was abandoned, excepting at the outer corners, and the oak timber fender system, which was the original construction, was adopted. There is no evidence tending to show the relative cost of construction according to the old system or according to the system thus adopted; but

the evidence is open .to the inference that the change in the fender system was made by the defendant, and, if so, that is immaterial.

The evidence offered on the part of the plaintiff also tended to show separately the reasonable cost of many of the classes of items of reconstruction; but the case was submitted to the jury on the theory that the plaintiff was claiming the entire contract price of the work, and there was no request on the part of the plaintiff to have the jury instructed that it was entitled to recover the reasonable cost of the repairs which should have been, but were not, made by the defendant.

On the part of the defendant, evidence was given tending to show that during his occupancy under the prior leases he maintained the pier in proper repair, and that while in possession under the lease in question, and in the year 1902, he reconstructed the fender system, backing logs, and sheathing, and replaced defective decking and rangers, and that in 1907 he "renewed the deck" of the pier, and that otherwise during his occupancy he kept the pier in proper order and repair; but 'the repairs made by him did not extend to the substructure, and with respect to that evidence was given tending to show that its condition was not readily discoverable, and that it would be necessary to go under the pier in small boats and bore into the piles and timbers, or test them with a pike.

The court, during the progress of the trial, apparently overlooking, or failing to give effect to, the obligation of the tenant to *put* the pier in proper repair at the time he entered under the lease, repeatedly ruled that it was necessary for the city to show the condition of the pier at the commencement of the term and at the termination thereof, and that the damages recoverable were to be measured by the cost of placing the pier in as good condition as it was in at the commencement of the term. In the charge, the court instructed the jury that it was the duty of the tenant to put and keep and maintain the pier and every part of it in good and sufficient order and repair, and to surrender it in that condition of repair, and stated that the duty was the same as if he leased a house under a covenant to turn it over at the expiration of the term in good order and repair, and that his duty would be to turn the house over in a condition practically the same as that in which he received it, but that there would be no duty to reconstruct it, and that if the work that was done practically constituted the construction of a new pier, then the plaintiff would not be entitled to recover, but that if the character of the work done by the plaintiff was such as to put the pier in good and sufficient repair, as required by the lease, then plaintiff was entitled to a verdict for such sum as it had fairly expended in putting the pier in that condition, taking into account the character of the construction and the nature of the material of which the pier was originally constructed.

At the close of the charge, counsel for the plaintiff inquired whether the court intended by the charge to instruct the jury that there was no duty on the part of the tenant to reconstruct parts of the pier which were worn out. The court replied that the jury had not been so instructed, but merely that it was not the duty of the defendant to

construct a new pier, and that it was left to the jury as a question of fact to determine whether it was the duty of the defendant to reconstruct parts that were worn out, and in that connection the court further charged as follows:

"He had to do anything that would be required to put, keep, and maintain the property, and every part thereof, in good and sufficient order and condition, at his own cost and expense. His testimony is, and the testimony given on his behalf is, that he actually did do that; that at the time of the expiration of the term he left it in the same order and condition, or, at least, in as good order and condition, as that in which he got it. If he did that, then the burden which was imposed upon him has been actually met by him. If he did not do that, then, to the extent to which he failed to do it, and only to that extent, may the city hold him."

Thereupon counsel for defendant said, "I understand you to say there was no duty to rebuild the pier, or to practically rebuild the pier;" to which the court replied, "Yes, there was no duty of that kind." Counsel for the plaintiff thereupon took an exception as follows: "I respectfully except to that portion of your honor's charge." We are of opinion that this exception should not be limited to the last preceding instruction given at the suggestion of counsel for the defendant, to the effect that there was no duty on the defendant to rebuild or practically to rebuild the pier, but that it should be deemed an exception to the instruction immediately preceding that, to the effect that the defendant discharged the burden imposed upon him if he left the pier in the same order and condition, or in as good order and condition, as that in which he found it at the commencement of the term. Manifestly that instruction was erroneous, for it relieved the defendant of his express obligation to put the pier in proper order and repair at the outset.

[2] We think the case was tried and submitted to the jury on another erroneous theory, namely, that the inquiry was whether the defendant was answerable to the plaintiff for the moneys expended by it in reconstructing the pier. The amount thus expended by the city was wholly immaterial, excepting in so far as it tended to show the reasonable cost of making the repairs which it was the duty of, the defendant to make, and which he failed to make. It was immaterial whether the plaintiff reconstructed the pier, or what it did with the pier, after the expiration of the term. Appleton v. Marx, 117 App. Div. 206, 102 N. Y. Supp. 2, affirmed 191 N. Y. 81, 83 N. E. 563, 16 L. R. A. (N. S.) 210, and note, 14 Ann. Cas. 150, and note to Boardman v. Howard, 64 L. R. A. 667. The learned court was right, I think, in ruling that the tenant was under no obligation to rebuild the pier, for the provisions of the lease do not show that the tenant's covenants to repair contemplated rebuilding. His only covenant to rebuild was in the event of the destruction of the pier by fire, floating ice, action of the elements, or accident, and with respect thereto the lease contains express provisions regulating the rebuilding, which was to be according to plans and specifications submitted to and approved by the board of docks, and under its direction. The repairs he was required to make were to be made on the existing structure, and they were required to be made without plans or supervision.

The city, to recover herein, must show a condition of disrepair of the pier which would have justified it in terminating the contract if the tenant failed to make the repairs during the contract period. His duty involved *reconstruction work and replacements* to a certain extent. It was his duty to replace decayed, worn out, or damaged material on the surface or exterior of the pier, and on the interior and underneath where this was reasonably necessary and practicable, and where the work could be done without unduly depriving him of the beneficial use of the pier; but the covenants of the lease did not, I think, require him to suspend the use of the pier and remove the entire structure resting on the piles, and remove or splice or fish-plate piles which were decayed above the water line, or to incur extraordinary expenditures in supporting the body of the pier in place and removing or splicing or fish-plating piles where that became generally necessary by reason of the age of the piles.

In the case at bar it appears that the average life of the piles had been passed or reached, and that it was necessary to remove most of them, or to splice or fish-plate the upper ends of the majority of them, which, according to the evidence, would require the removal of the entire body of the pier above them, and would constitute a rebuilding of the pier. In Lochrow v. Horgan, 58 N. Y. 639, covenants by a tenant of a house "to make all necessary repairs" and "to keep the premises in tenantable order" were construed in a memorandum opinion as requiring him to rebuild a leaning wall of the building, and that this was not excused by a subsequent clause requiring the tenant to surrender the premises at the expiration of the term in as good condition as at the commencement, necessary wear and tear and damage by the elements excepted, and that decision was followed on like facts in Bushwick Realty Co. v. S. F. P. & C. Co., 129 App. Div. 533, 114 N. Y. Supp. 13; but the Court of Appeals in May v. Gillis, 169 N. Y. 330, 62 N. E. 385, held that a lease obligating a tenant of a house "to make all inside and outside repairs," and to leave the demised premises in "as good condition as reasonable use and wear thereof will permit, damages by the elements excepted," only required him to make ordinary and not extraordinary repairs, and that Lochrow v. Horgan, supra, must be deemed to have been *distinctly* overruled by Butler v. Kidder, 87 N. Y. 98, if the covenants under review in the former were not distinguishable from those under review in the latter or then under review.

The general rule is that in an action brought by a landlord after the expiration of a lease for a breach of covenants *to keep* and to leave a building or structure in good order and repair the measure of damages is the amount it would cost at the expiration of the lease to put the building or structure in the condition in which the tenant should have left it. Appleton v. Marx, 117 App. Div. 206, 102 N. Y. Supp. 2, affirmed 191 N. Y. 81, 83 N. E. 563, 16 L. R. A. (N. S.) 210, 14 Ann. Cas. 150; Lehmaier v. Jones, 100 App. Div. 495, 91 N. Y. Supp. 687; Ducker v. Del Genovese, 93 App. Div. 575, 87 N. Y. Supp. 889; Wanamaker v. Butler Mfg. Co., 136 App. Div. 265, 120 N. Y. Supp. 1000. I am of opinion that it is now the general rule that a tenant

who merely covenants to put and keep in repair is not obliged *to rebuild,* where the rebuilding is not rendered necessary through his failure to perform his covenant to keep in repair, or through other fault on his part. Butler v. Kidder, 87 N. Y. 98; Ducker v. Del Genovese, *supra;* Lehmaier v. Jones, supra; May v. Gillis, supra; Appleton v. Marx, supra; Herald Square Realty Co. v. Saks & Co., 215 N. Y. 427, 109 N. E. 545. The burden is on the plaintiff in such case to show the repairs which the tenant should have made, and failed to make, and the reasonable cost thereof. Hawkins v. Ringler & Co., 47 App. Div. 262, 62 N. Y. Supp. 56. If the rebuilding of the pier at the expiration of the term was rendered necessary, owing to the failure of the tenant to perform his duty to put and keep it in repair, as herein defined, which did not require him to rebuild it, then, of course, he would be liable for the entire cost of the work.

It follows that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. Order filed.

McLAUGHLIN, J., concurs.