Nathaniel T. Helman, J.
The action of the City of New York on the law side of the court has been consolidated with the action of Farrell Lines against the city on the equity side of the court. The complaint in the action of the city consists of three causes of action, (1) for an increase in rent resulting from defendant’s holding over by remaining in possession after the expiration of its lease, (2) charges for deferred maintenance and failure to repair, on the 35th Street pier, in the amount of $286,588, and (3) similar charges with respect to the 33rd Street pier in the amount of $222,349. The equity action is for a declaratory judgment as to respective rights and obligations of lessor and lessee under a lease to the 35th Street pier made in March of 1958.
The 33rd Street pier was built in 1910; the 35th Street pier in 1915. Leases to Farrell Lines, Inc., covering both piers were executed on March 4, 1958, for 10-year terms expiring January 31, 1968. In the year of 1956, the 35th 'Street pier was badly damaged by an explosion and fire. Notwithstanding its deteriorated condition, it was in January, 1958, leased to the Northeast Marine Terminal Co., Inc., which occupied the premises until June 30,1962, when Farrell took possession under its lease. The issues between the parties as to the 35th Street pier arise from conflicting interpretation of the lease provisions. The questions raised in the 33rd Street pier litigation relate principally to the nature and extent of the damages sustained by the city and its right to a recovery notwithstanding the contemplated demolition of that pier.
Rent Action — In its first cause of action, the city alleges that a letter was addressed by registered mail to Farrell on January 19, 1968, just prior to the expiration of both leases, informing *544 the tenant that its rental as a holdover tenant after January 31, 1968, for both piers, would be $603,472.63 per annum, or an increase of 10% over the prior rentals. Asserting that the tenant remained in possession as a holdover for the months of February, March and April, 1968, the city contends that the tenant thereby elected to remain as a month-to-month tenant under the increased rental set forth in the letter. Emphasis is placed by the city on a lease provision granting tenant an option to renew for an additional term, at a 10% rate increase. It is undisputed that the tenant continued to pay its regular rental during the three-month period, and that the payments were accepted by the city.
Section 232-c of the Beal Property Law was enacted by the Legislature in 1959 to create a tenancy at will when a tenant held, over after the expiration of his term with the consent of the landlord. In specific terms, it states that acceptance of rent by a landlord creates a month-to-month tenancy only. Its provisions do not authorize the landlord to impose a liability on the tenant, without its consent, for increased rental following expiration. The statute was interpreted by the Court of Appeals in Jaroslow v. Lehigh Val. R. R. Co. (23 N Y 2d 991) following an apparent conflict in the views of the Appellate Terms of the First and Second Departments, concerning its intent and meaning. Said the court: ‘ ‘ Section 232-c of the Beal Property Law changes the common-law rule relating to creation of a holdover tenancy. It provides that the mere holding over by a tenant whose term is longer than one month does not allow the landlord to create a holdover tenancy without his acceptance of rent from the holding over tenant * * * An action for nonpayment of rent, based on a notice purporting to fix a rent, never agreed upon by tenant and never paid by tenant, does not lie, there being no tenancy in fact or at law obligating the tenant for such rent.” Accordingly, the city may not maintain an action for increased rent. The first cause of action will be dismissed.
35th Street Pier — In support of its prayer for a declaratory judgment and as a defense to the city’s action for deferred maintenance, Farrell asserts that failure of the city to repair, rehabilitate and restore the pier, pursuant to its undertaking in the Farrell lease, deprived the tenant of a proper use of the pier. It is alleged that following the fire, a large part of the substructure consisting of piles and other timbers supporting the pier, together with the concrete deck placed thereon, were in an advanced state of decay, deterioration and disrepair, and remained in such condition at the commencement of Farrell’s *545 occupancy. By the terms of the lease, the city undertook the work of restoration, and specifically agreed to construct a new shed and other installations in accordance with sound engineering practice. It is the position of Farrell that the tenant was not obligated to make repairs until the city first put the pier in condition. In that regard, the court has had the benefit of a scholarly analysis of the appropriate lease provisions by Mr. Justice McGtiveen, on a summary judgment motion. The learned opinions there expressed will in all respects be adopted by the court as follows: (1) The agreement envisioned that repairs and restorations required by the city, would be made before Farrell’s occupancy; (2) performance by the city was a condition precedent to defendant’s obligation to maintain and repair; (3) customary “as -is” provisions relating to tenant’s occupancy must be considered in the light of other provisions of the lease, and read in conjunction with introductory phrases such as “ except as otherwise provided herein,” etc.
Whether covenants by lessor and lessee are mutually independent, can only be determined by the lease provisions themselves. Conceivably, a landlord’s undertaking to rebuild, restore and rehabilitate, may not, in a particular case, relate to the basic structure of the premises to be occupied, in which event the tenant’s obligation to repair may be distinct and independant. Here, both the superstructure and the substructure were involved in the landlord’s undertaking to rebuild, to the extent that, lacking a complete restoration, tenant’s covenant to repair could not come into being. Similar views were expressed by the Appellate Division of the First Department in a case involving an adjoining pier where identical covenants appeared in the lease. (Isbrandtsen Co. v. City of New York, 33 A D 2d 1018.) In granting tenant’s prayer for a declaratory judgment, the court said: “the City of New York, as lessor, has not fulfilled its obligations1 under Article Fourth of the lease and that plaintiff Isbrandisen as lessee is not obligated to perform its covenant of repair and maintenance and of surrendering in good repair unless and until the City of New York completes its rehabilitation work in accordance with the provisions of Article Fourth * * * According to the terms of the lease, the obligation of the lessee to keep and maintain the pier in good order and condition did not arise until the lessor city rehabilitated the pier, as it had undertaken to do contractually.”
It was further claimed in the Isbrandisen case that the city had substantially performed its covenant to restore, a contention which the Trial Judge upheld. The appellate court, however, struck out the decretal paragraph of the judgment so pro *546 viding, and substituted language declaring that the contract was not fully performed by the lessor. 'Said the court: “ The fact that the terms of the lease in practice became financially onerous for the city is no justification for the city not to have finished the work as called for by its contractual undertaking. Neither the extent of work done by the city nor the amount of money expended by the city are the yardstick. The contract calls for full performance. On this record, that has not been accomplished.”
Preliminarily, the city takes the position that it has fully performed the work of restoration. This contention is not, however, supported by the evidence in the record. The fender system was left in a state of disrepair, line and brace piles in substantial number were rotted, and wood-caps were left exposed. The superstructure suffered from defects in the lighting and toilet facilities as well as the roof installation, the steel construction and wiring. While the court is reluctant to accept the estimate of Farrell’s expert of the amount of $849,075, as need for completion, it is obvious that the city’s compliance with its undertaking to rebuild was far from “substantial”, and certainly not a full and complete performance. .
Nor can I find any merit to the contention of the city that Farrell is bound to accept the physical condition of the premises as it existed on January 4, 1960, the date of the commencement of the two-year occupancy of Northeast. True it is that both the Farrell and Northeast leases were approved by the Board of Estimate at about the same time and that the Farrell resolution contained the language: ‘ ‘ The City will have repaired, restored and rehabilitated the pier as provided in the lease covering the demised premises with the Northeast Marine Terminal Company, Inc.” No relationship existed between Northeast and Farrell, and the two-year preliminary occupancy of Northeast was intended to permit that company the use of the premises in preparation for its occupancy of a new 39th Street terminal.
In the clearest of terms, article Eighth of the Farrell lease provided for commencement of the term 30 days after the termination of the Northeast lease. Absent any contrary provision, each of the covenants of the lease became effective on that day, including specifically the city’s unequivocal undertaking to build and restore as provided in the opening paragraph. The reference in the resolution of January 23, 1958 to repairs “ as provided in the Northeast lease ” can be regarded as descriptive of the conditions requiring repair as of that day, but can in no way be related to other repairs or installations made necessary *547 by circumstances and conditions which arose in the subsequent years from 1958 to June, 1962.
Some pointed extracts from the opinion of Justice McGrvEBn can serve to amplify this court’s views of the obligations undertaken by the contracting parties: “ Considering the fact that the pier was in an unusable condition, as a result of the 1956 explosion and fire, when the lease was signed between the parties herein in 1958, it would be unrealistic to assume that plaintiff was agreeing to take the pier in an ‘as is ’ condition after another tenant’s use without defendant’s full adherence to its stated obligations to repair, rehabilitate and restore * * *.
“ It did not abrogate defendant’s duty to do agreed-upon work before plaintiff’s entry. Defendant’s claim that all necessary work was completed before Northeast occupied the property cannot be of concern to plaintiff within the terminology of its own particular lease.”
The city has conceded that the two-year occupancy of Northeast resulted in damage from breach of the covenant of the tenant to repair, in the amount of $79,465.64. This item, alone, if not affecting a “ substantial ” performance by the city of its obligation to rebuild under the Farrell lease, certainly affected its “ full and complete ” performance.
The city having failed to perform its covenants to restore, the obligation to repair never came into being, and Farrell is entitled to judgment dismissing the second cause of action. In the equity action, plaintiff is entitled to a declaratory judgment in accordance with the foregoing.
33rd Street Pier — No rehabilitation or restoration by the city was required on this pier under the terms of the Farrell lease, and the tenant does not question its liability under the repair and surrender clauses. Its denial of liability as to this cause of action is founded on claims that (1) the city suffered no damage, (2) the making of repairs would have constituted economic waste and would constitute a windfall and unjust enrichment, (3) the measure of damages should be diminution in value and not cost of repairs.
It is contended by Farrell that the 33rd Street pier, already 58 years old, had physically deteriorated to such an extent that it would have been impracticable to repair or rebuild it. Changes in methods of handling cargo passing through the Port of New York had taken place, to the extent that the bulk of such cargo was being shipped in containers. Existing facilities were not suited to container shipping and, concededly, the pier is being presently demolished and will be replaced by a *548 container pier. Farrell takes the position that it would have been economic waste to have expended moneys in making repairs on an obsolescent pier. The city, while acknowledging the changes that have taken place, asserts that such piers are useful for warehousing and nonsteamship uses, are still in use in New York City, and that in the building of a container pier, a good deal of the old substructure is used.
Counsel for Farrell have extended their diligent research on the subject of “ economic waste ” and the use of the “ value ” rule, as a measure of damages, into English decisional law as well as the opinions of courts of other States and the Federal court. The leading case in our State on the subject is Appleton v. Marx (191 N. Y. 81) which held that repairs made by a subsequent tenant at his own expense did not inure to the benefit of a prior tenant who had violated his own covenant to repair. Said the court (pp. 86-87): “ The lessor’s right of action for damages consequent upon the breach of covenant vested in him before any estate vested in the grantee of the subsequent lease ”,
Principal reliance is placed by the tenant on cases involving a lessee’s undertaking to restore leased premises to their original condition, an obligation frequently burdened with possibilities of severe hardship. In Harder Realty & Constr. Co. v. City of New York (64 N. Y. S. 2d 310) the court distinguished between damages to restore property to its original condition, and damages resulting from failure to make repairs. As to the former, the court chose the “ value ” rule, citing Levine v. City of New York (249 App. Div. 625). In similar vein, the Federal courts have approved a rule in restoration cases to the effect that plaintiff must establish that the fair market value of the building in the condition in which defendant had covenanted to restore it, was greater than its market value in an unrestored state at the termination of the lease. (Dodge St. Bldg. Corp. v. United States, 341 F. 2d 641; Realty Assoc. v. United States, 138 F. Supp. 875.) In construction cases, covenants to restore have been construed liberally so as to avoid severe hardships. Some examples are (1) tearing down a building because the wrong piping was used (Jacob & Youngs v. Kent, 230 N. Y. 239); (2) denying the requested removal of a 43-foot driveway (Belizzi v. Huntley Estates, 3 N Y 2d 112); (3) denying a substantial award for ‘ ‘ underpinning ’ ’ when ‘ ‘ the buildings have suffered no physical or aesthetic injuries ” (Harder Realty & Constr. Co. v. City of New York, supra).
Numerous factors, however, enter into the determination of damages sustained by the lessor from breach of a covenant to *549 repair which have not been considered by the tenant in this case. Leases executed by a municipality as lessor are frequently based on a formula rent system which is designed to keep the structures self-sustaining. Income is not as attractive to the city as is the preservation of the pier for public use. Costs of maintenance are frequently interlocked with the amount of the rental charged. Thus, the city expended close to $3,000,000 in rebuilding the 35th Street pier, receiving in turn a rental considered moderate by any real estate standards. The agreement to “ maintain ” the property represented a basic consideration to the lessor, and damages or destruction to the leasehold affected seriously the lessor’s capital investment.
In the City of New York hundreds of old structures are demolished annually due to changes in neighborhood, population, and at times because of the ingenuity and enterprise of builders. To say that the construction of an office building or apartment house, where once stood a group of ¡small stores, would deny to the owner a right of recovery for breach of covenants to repair by his former tenants, is simply unrealistic.
In several cases, the tenant’s liability has been held firmly established when the proof showed that “ at the expiration of the lease, the pier was not in good and sufficient repair and condition ’ ’ and that the tenant had not ‘ ‘ complied with his agreement to put, keep and maintain it in the specified repair and condition ” (City of New York v. McCarthy, 171 App. Div. 561). The covenant to repair imposes on the tenant the obligation to repair even where the premises are not in good condition at the commencement of the term (2 N. Y. Landlord and Tenant, § 930, p. 994; Lehmaier v. Jones, 100 App. Div. 495; Facopoulos v. Levenson, 200 App. Div. 918; Ridder v. Mutual Paper Co., 126 Misc. 108). On the other hand, the fact that the property may be in better condition than when it was originally leased does not foreclose plaintiff from seeking damages (Black & Yates v. A. R. Fuels, Inc., 26 Misc 2d 627). Nor does the fact that the repairs were not actually done or paid for, by the lessor, deny him recovery (McKinnon v. Smith, 52 Misc 2d 349; 1 McAdam, Landlord and Tenant [5th ed.], p. 458).
The parties have supplied the court with charts based on joint incoming and outgoing surveys. In evaluating cost items, I am satisfied that the city’s expert, using 1968 prices generally, gave Farrell the benefit of any doubt on the reasonable cost of repairs, and his estimate of damages to the 33rd Street pier in the sum of $222,349 will be accepted. Judgment may be entered accordingly.