**In the Matter of D. H. OVERMYER CO., INC. (TEXAS) and D. H. Overmyer Co., Inc. (Ohio), Debtors.**

**Natalie SHAPIRO and Harry I. Subin, individually and as trustees, doing business as Arcadia Enterprises, Plaintiffs,**

**v.**

**D. H. OVERMYER CO., INC. (TEXAS) and D. H. Overmyer Co., Inc. (Ohio), Defendants.**

**Bankruptcy No. 73 B 1129.**

United States Bankruptcy Court, S. D. New York.

July 15, 1981.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for plaintiffs Harry Subin and Natalie Shapiro; Lawrence D. Bernfeld, and Jack Weinberg, New York City, of counsel.

Robson & Miller, New York City, for debtor; Morton S. Robson and Michael Venditto, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for custodial receiver; Robert Soriano, New York City, of counsel.

JOEL LEWITTES, Bankruptcy Judge.

# I

## INTRODUCTION

Plaintiffs, Natalie Shapiro and Harry I. Subin, as trustees and doing business as Arcadia Enterprises ("lessors" or "plaintiffs"), have commenced this adversary proceeding[1] against the substantively consolidated Chapter XI debtors[2], D. H. Overmyer Co., Inc. (Texas), as lessee of the subject premises ("lessee" or "DHO Texas") and D. H. Overmyer Co., Inc. (Ohio) ("DHO Ohio") as guarantor of the lessee's lease obligations (collectively referred to sometimes as ("defendants").

Plaintiffs, in their complaint, which was served upon defendants on December 24, 1980, allege two claims for relief: (1) damage caused them as lessors by reason of the defendants' untimely lease payments of rent without interest; and (2) that lessor's mortgage loan with its mortgagee, Mortgage and Trust Inc., may be subject to foreclosure by reason of defendants' failure to make the repairs required under the lease between lessors and defendants.

The relief requested in the complaint is (1) a declaration by the Court that the lease is terminated; (2) a direction by this Court that defendants quit and surrender possession of the subject premises; (3) a direction by this Court that defendants pay, *inter alia*, all outstanding rent obligations, interest on late payments of rent and costs of repairs; and (4) granting to plaintiffs, *inter alia*, plaintiffs' costs, disbursements and attorneys fees incurred in connection with this adversary proceeding.

Defendants, in their answer, deny that plaintiffs have been damaged and deny that the latter can reasonably be expected to suffer irreparable injury by defendants' actions. Moreover, on information and belief, they deny plaintiffs' allegations of untimely payment of rent and that plaintiffs' mortgagee informed plaintiffs that the latter's mortgage was in jeopardy because of fail-

---

1. An adversary proceeding, in the bankruptcy court, is commenced by the filing of a complaint, Bankruptcy Rule 703, 411 U.S. 1069, 93 S.Ct. 3147, 37 L.Ed.2d lxvi and may be instituted, as here, to recover money and property. Bankruptcy Rule 701, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi.

2. The purpose and effect of substantive consolidation, in this Court, have been the subject of several decisions in this Circuit. See *e. g. Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *In re Flora Mir Candy Corp.*, 432 F.2d 1060, 1062–3 (2d Cir. 1970).

ure to keep the subject premises in good repair.

No affirmative defenses were asserted by defendants in their answer.

Additionally, it is noteworthy that the only two contentions of fact set forth by defendants, in the pre-trial order, are that: (a) defendants have made all of the rent payments required pursuant to the lease; and (b) defendants have maintained the subject premises in

> ". . . thorough repair and good, safe and substantial order and condition and at present have three contractors working on paving, roofing and painting the demised premises."[3]

After hearing the testimony adduced by the parties on the trial of this adversary proceeding, examining the exhibits, the pleadings, the pre-trial order and the briefs submitted by counsel, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) and its procedural bankruptcy analogue, Bankruptcy Rule 752(a).[4]

## II

### FINDINGS OF FACT

1. Defendants DHO Texas or DHO Ohio built certain warehouse premises on Sea Mist and Overmyer Drives, in the City of Houston, Harris County, Texas ("subject premises").

2. In June 1970, DHO Texas sold the subject premises to one David L. Subin.

3. By written agreement, dated June 12, 1970 ("lease"), David L. Subin, leased the subject premises to DHO Texas for a term of twenty (20) years, commencing June 1, 1970 and terminating July 31, 1990.

4. The lease is representative of a form lease prepared and used by Overmyer defendants and various affiliates which are consolidated debtors in this Chapter XI case in sale and leaseback transactions similar to the sale and leaseback transaction between plaintiffs and defendants.

5. Defendant, DHO Ohio, by written instrument dated June 12, 1970, guaranteed performance of DHO Texas' obligations under the lease.

6. Plaintiffs Natalie Shapiro and Harry I. Subin individually, and as trustees for their respective children, doing business as Arcadia Enterprises, obtained an ownership interest in the subject premises on December 13, 1976 and presently are the owners of such subject premises.

7. By letter dated February 8, 1977, defendants were notified that plaintiffs were the owners of the subject premises and that all future payments and correspondence pertaining to such premises should be sent to Arcadia Enterprises.

8. *The Subject Premises*:

There are four warehouses: two large warehouses, designated at trial as Buildings 1 and 2—each made up of two units designated A & B, Building 1, and A & B Building 2, and two smaller single unit warehouses designated as Buildings 3 and 4, or Building 3C and Building 4C;

each of the six units (*i. e* Units A and Units B of Buildings 1 and 2 and Unit C, Buildings 3 and Unit C, Building 4, are approximately 268 feet (east to west) by 150 feet (north to south);

the warehouse floors are made of concrete slabs and are at the level of motor truck beds, three and one-half to four feet above ground;

the perimeter walls of each warehouse are made of Dur-O-Wal, *i. e.*, steel reinforcement, and concrete blocks with two cores through each block;

the roof assembly over each warehouse consists of gravel, asphalt, felt, insulation, gravel guard, gutters and downspouts;

the roof assembly over each warehouse rests on a 22 ″ gauge steel deck;

there is a small office building attached to Building 2, Unit B and having its own roof;

---

**3.** Pre-Trial order ¶ 7(b).

**4.** 411 U.S. 1082, 93 S.Ct. 3158, 37 L.Ed.2d lxxii.

there is a small office building attached to Building 1, Unit B and having its own roof;

the site paving at the truck doors is made of concrete; the balance of the site paving is made of asphalt;

there is a railroad siding with two tracks running east to west between Buildings 1 and 2 and Buildings 3 and 4.

9. Two of the warehouses, Buildings 2 and 3, are vacant and have been vacant, since January 1, 1981 and November, 1980, respectively.

10. Warehouses, Buildings 1 and 4, are occupied by J. C. Penney, Inc. under a sublease between Overmyer and Penney which is to expire on August 31, 1981.

11. By stipulation dated April 18, 1974, between plaintiffs' father and predecessor in interest, David L. Subin, and Overmyer, which was "So Ordered" by this Court, it was agreed that:

"The Landlord understands and agrees that the current bankruptcy proceeding involving Overmyer which is pending in the United States District Court, for the Southern District of New York, is not and shall not be considered a default under the Lease. . . . so long as the Receiver, or his successor,[5] continues to make the use and occupancy payments and the other obligations undertaken herein and all other obligations of Overmyer under the Lease are performed by the Receiver or his successor. . . ."

12. The subject lease, dated June 12, 1970, contains the following provisions with respect to defendants' obligations to pay rent:

"Section 3.01. Tenant shall pay to Landlord, at either his principal office or such other place as Landlord shall specify in writing, rent. . .payable on the first day of the month. . . .

\*  \*  \*  \*  \*  \*

"Section 3.04. The net rents, additional rents, and all other sums payable under this Lease to or on behalf of Landlord, shall be paid, without notice or demand and without set-off, counterclaim, abatement, suspension, deduction or defense.
"Section 3.05. Tenant waives all rights now or hereafter conferred by law. . .(b) to any abatement, suspension, deferment or reduction of the net rents or additional rents or any other sums payable under this Lease, except as expressly provided in this Lease."

13. The subject lease contains the following provisions relevant to defendants' obligations to repair the subject premises:

"Section 6.01. Landlord shall not be required to furnish any services or facilities to the Demised Premises, and shall have no obligation to Tenant except as expressly provided in this Lease, Tenant hereby assuming the full and sole responsibility for the condition, construction, operation, repair, replacement, maintenance and management of the improvements to the Demised Premises. Tenant hereby expressly waives the right to make repairs at the expense of Landlord as provided in any statute or law in effect at the time of the execution of this Lease or which may be hereafter enacted. Landlord shall not be required to rebuild any improvements on the Demised Premises or to make any repairs, replacements or renewals of any nature or description to the Demised Premises or any improvement thereon, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatever in connection with this Lease or to maintain the Demised Premises in any way.
"Section 6.02. Tenant shall, at all times and at its own cost and expense, keep, replace and maintain in thorough repair and good, safe and substantial order and condition all buildings and improvements

5. By order of this Court dated January 11, 1977, the consolidated debtors were revested with their properties, as debtors-in-possession, thus ending the tenure of the Receiver appointed by United States District Judge Bonsal on December 6, 1973. See Matter of D. H. Overmyer Co., Inc., 3 B.R. 678 at 680 and at 684 n.25. (Bkrtcy.S.D.N.Y.1980) (Bankruptcy Court).

and paved areas erected on the Demised Premises, or forming a part thereof (including all building equipment which is an integral part of the building structure), both inside and outside, structural and non-structural, extraordinary and ordinary . . . and Tenant shall likewise at all times and at its own cost and expense put, keep, replace and maintain all personal property and equipment attached to or used in connection with the Demised Premises in full operating condition."

14. The subject lease contains the following provisions with respect to events of default:

"*Section 15.01.* Any of the following occurrences or acts shall constitute an event of default under this Lease: (a) if Tenant (regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity, or before any administrative tribunal, which have or might have the effect of preventing Tenant from complying with the terms of this Lease) shall fail to (i) make any payment of net rent within ten (10) days after Landlord shall have given notice to Tenant that such payment is due, or (ii) make any payment of additional rent or any other sum herein specified to be paid by Tenant, or (III) observe or perform any of Tenant's other covenants, agreements or obligations hereunder, within thirty (30) days after Landlord shall have given notice to Tenant specifying such default . . .

"*Section 15.02.* If any event of default shall have happened and be continuing, the Landlord shall have the right at his election, then or at any time thereafter while such event of default shall continue, to give Tenant written notice of Landlord's intention to terminate the term of this Lease on a date specified in such notice.

"*Section 15.05.* If under any of the preceding provisions of this Article XV Landlord shall be entitled to give Tenant a notice of termination of the term of this Lease, Landlord without giving such notice of termination and notwithstanding the continuance of the term of this Lease

shall have, to the extent permitted by law, all rights, powers and remedies given to Landlord by the preceding provisions of this Article, and Tenant shall have the obligations imposed upon it by such provisions.

"*Section 15.08.* In the event Tenant shall be in default in the performance of any obligation under this Lease and an action shall be brought for the enforcement thereof in which it shall be determined that Tenant was in default, Tenant shall pay to Landlord all expenses incurred in connection therewith including reasonable attorneys' fees."

15. By final judgment entered on or about April 20, 1979, in a prior proceeding commenced by the instant plaintiffs against these defendants, this Court directed that:

"Commencing May 1, 1979, Overmyer [Texas] and DHO [Ohio] shall pay plaintiffs the rent and additions to rent payable under the Lease on or before the fifth day of every month, without notice or demand therefor."

16. Defendants paid rent for the month of September 1980 on or about September 19, 1980, without interest.

17. On September 16, 1980, plaintiffs sent defendants written notice of the latter's default in failing to make timely payment of September 1980 rent.

18. Defendants paid rent for the month of October 1980 on or about October 3, 1980.

19. Defendants paid rent for the month of November 1980 on or about November 24, 1980, without interest.

20. Defendants paid rent for the month of December 1980 on or about December 22, 1980, without interest.

21. The items in need of repair and the cost of repairs required by the provisions of the lease are as follows:

A. Building 1:

(a) Removal of existing roof assembly and steel decking — $ 78,784.00

(b) Neutralize rust of structural steel other than steel deck — 12,995.50

(c) Purchase and installation of steel deck — 61,893.50

A. Building 1—Cont'd

(d) Purchase and installation of new roof assembly (sheet metal, fiber glass insulation board [½ inch thickness], felts, asphalts, aggregate, gutters and down-spouts) ... 116,831.00

(e) Repair to cement masonry unit walls ... 20,584.00

(f) Water proofing of cement masonry unit walls ... 55,098.75

(g) Repair to structural floor slabs ... 877.00

(h) Personnel doors ... 890.00

(i) Overhead doors ... 902.00

(j) Dock bumpers ... 1,368.00

(k) Painting of all exterior metals, overhead doors and dock bumpers ... 8,070.75

(l) Hardware ... 113.00

(m) Electrical and general ... 500.00

TOTAL ... $358,907.50

B. Building 2:

(a) Removal of existing roof assembly and steel decking ... $ 78,784.00

(b) Neutralize rust of structural steel other than steel deck ... 12,995.50

(c) Purchase and installation of steel deck ... 61,893.50

(d) Purchase and installation of new roof assembly (sheet metal, fiber glass insulation board [½ inch thickness], felts, asphalts, aggregate, gutters and down-spouts) ... 116,831.00

(e) Repair to cement masonry unit walls ... 20,584.00

(f) Water proofing of cement masonry unit walls ... 55,098.75

(g) Repair to structural floor slabs ... 18,802.00

(h) Personnel doors ... 120.00

(i) Overhead doors ... 240.00

(j) Dock bumpers ... 2,088.00

(k) Painting of interior metals overhead doors and dock bumpers ... 8,070.75

(l) Hardware ... 113.00

(m) Electrical and general ... 1,500.00

(n) Windows; glass and glazing ... 168.00

(o) Acoustical ceiling ... 521.00

(p) Cleaning carpets ... 260.00

TOTAL ... $378,069.50

C. Building 3:

(a) Removal of existing roof assembly and steel decking ... $ 39,067.00

(b) Neutralize rust of structural steel other than steel deck ... 6,444.00

(c) Purchase and installation of steel deck ... 30,622.00

(d) Purchase and installation of new roof assembly (sheet metal, fiber glass insulation board [½ inch thickness], felts, asphalts, aggregate, gutters and down-spouts) ... 57,912.00

(e) Repair to cement masonry unit walls ... 12,736.00

(f) Water proofing of cement masonry unit walls ... 34,121.25

(g) Repair to structural floor slabs ... 1,734.72

(h) Personnel doors ... 920.00

(i) Overhead doors ... 120.00

(j) Dock bumpers ... 828.00

(k) Painting of exterior metals, overhead doors and dock bumpers ... 3,927.00

(l) Hardware ... 90.00

(m) Electrical and general ... 1,500.00

TOTAL ... $190,021.97

D. Building 4:

(a) Removal of existing roof assembly and steel decking ... $ 39,067.00

(b) Neutralize rust of structural steel other than steel deck ... 6,444.00

(c) Purchase and installation of new gauge steel deck ... 30,622.00

(d) Purchase and installation of new roof assembly (sheet metal, fiber glass insulation board [½ inch thickness], felts, asphalts, aggregate, gutters and down-spouts) ... 57,912.00

(e) Repair to cement masonry unit walls ... 12,736.00

(f) Water proofing of cement masonry unit walls ... 34,121.25

(g) Personnel doors ... 90.00

(h) Overhead doors ... 40.00

(i) Dock bumpers ... 828.00

(j) Painting of exterior metals, overhead doors and dock bumpers ... 3,927.00

D. Building 4—Cont'd

| | |
|---|---|
| (k) Hardware | 90.00 |
| (l) Electrical and general | 500.00 |
| TOTAL | $186,377.25 |

E. Site Retrofit:
(Maintenance and Repair work on site grounds):

| | |
|---|---|
| (a) General clean up of site | $ 4,000.00 |
| (b) Repairs to and overlay of asphalt | 49,186.00 |
| (c) Repairs to railroad spur | 21,150.00 |
| (d) Removing overgrowth and landscaping | 5,521.00 |
| (e) Removal of vine growth to exterior of buildings | 1,000.00 |
| (f) Splash blocks | 144.00 |
| (g) Shape drainage flow between Buildings 2 and 4 | 500.00 |
| (h) Guard pipes and railing at water meter | 390.00 |
| (i) Sprinkler system stations (stand pipes) | 100.00 |
| (j) Exterior piping | 150.00 |
| (k) Add fill at perimeter of buildings required to direct water away from building foundation | 2,205.00 |
| TOTAL | $84,346.00 |

22. The total fair and reasonable cost of repairs required by the provisions of the subject lease is $1,197,722.20.

23. On or about September 30, 1980, the defendants received a letter from the plaintiffs asserting that defendants had breached their obligations under the subject lease to maintain the premises in good repair.

III

A

APPLICABLE LAW

■ The decisions of the Supreme Court in *Erie R. Co. v. Tompkins*[6] and *Klaxon Co. v. Stentor Mfg. Co., Inc.* ("Klaxon rule")[7] have established that federal courts, in diversity of citizenship cases, must follow, on non-federal matters, both the substantive law and the conflicts of law rules, respectively, prevailing in the state in which they sit. Where the Court's jurisdiction, however, is invoked in a "federal question" case, a query surfaces, often unanswered,[8] as to whether, or under what circumstances, a federal judge or judicial officer, may look to applicable state law.[9]

Although it is arguable, that *all* controversies pertaining to the bankrupt estate arise "under the Laws of the United States",[10] and that at least facially, therefore, the *Klaxon* rule is inapplicable to proceedings and controversies in bankruptcy, the better rule, in my view, is that where "no [national] policy of the Bankruptcy Act would be offended,"[11] this Court is free to apply the *Klaxon* rule. Thus, although

"[t]he business of bankruptcy administration is to determine how existing debts should be satisfied out of the bankrupt's estate so as to deal fairly with the various creditors . . .[,] [o]bligations to be satisfied out of the bankrupt's estate . . . arise, if at all, out of tort or contract or other relationship created under applicable law. And the law that fixes legal

6. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938);

7. 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

8. See *e. g. D'oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 456, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942); *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 371, 65 S.Ct. 405, 408, 89 L.Ed. 305 (1945); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946).

9. See *e. g., Corporacion Venezolana de Fomento v. Vintero Sales*, 629 F.2d 786, 795 (2d Cir. 1980) (cases cited).

10. *National Mutual Ins. Co. of District of Columbia v. Tidewater Transfer Co.*, 337 U.S. 582, 652, n.3, 69 S.Ct. 1173, 1198, n.3, 93 L.Ed. 1556 (Frankfurter, J., dissenting).

11. *Fore Improvement Corp. v. Selig*, 278 F.2d 143, 147 (2d Cir. 1960) (Friendly, J. concurring). *Compare Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964).

consequences to transactions is the law of the several States." [12]

In this illustration, therefore, it would appear that with respect to the contractual relationships arising out of applicable state law, this Court, to the extent it deals exclusively with state created rights, properly should apply the *Klaxon* rule.

■ The determination, however, of "whether a federal or state rule of conflicts should govern", in fact, affects a rather minimal number of cases.[13] In our case, no choice of law problem really exists since, although arguably the law of more than one state might apply,[14] our research reveals that the applicable substantive law of the two "competing" forums—Texas and New York—virtually is the same.[15] Under the circumstances present here, where no policy of the Bankruptcy Act would be offended, even as to issues to be decided under Texas law,[16] this Court may, where necessary, properly look to New York law which is more developed in the areas of dispute addressed for resolution here.[16a]

## B

### *Tenant's Obligation To Repair*

### (1)

### *Generally*

■ A tenant, at common law, in the absence of an express covenant or a statutory duty, has the obligation to make leasehold repairs coextensive merely with the duty imposed upon him not to permit or

12. *Vanston Bondholders Protective Comm. v. Green, supra*, 329 U.S. at 169, 67 S.Ct. at 243 (Frankfurter, J. concurring). See also *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Cf. Madsen v. Prudential Fed. Savings & Loan Ass'n*, 635 F.2d 797, 802 (10th Cir. 1980) (removal in a suit "arising under" the laws of the United States); *Cf. In re Godwin Bevers Co., Inc.*, 575 F.2d 805, 807 (10th Cir. 1978) (where national policy of bankruptcy law specifically involved, federal bankruptcy law and not state law, governs); *In re Rosen*, 157 F.2d 997, 999 (3d Cir. 1946). *cert. denied sub nom. Fisch v. Standard Factors Corp.*, 330 U.S. 835, 67 S.Ct. 972, 91 L.Ed. 1282 (1947). *Cf. In re Bagley*, 6 B.R. 387, 389 (Bkrtcy.N.D.Ga.1980) where the Bankruptcy Judge, relying on a diversity case, in my view, mistakenly found that "a federal court *must* [should?] follow the conflicts law of the state in which it sits" in order to determine what law governs the interpretation, *inter alia*, of any contract. (emphasis supplied).

See also Hill, *The Erie Doctrine in Bankruptcy*, 66 Harv.L.Rev. 1013 (1953); 1A *Moore's Federal Practice*, Part 2, ¶ 0.322[1] at 3727 (1979).

13. Note, *Choice of Law Under Federal Statutes*, 68 Harv.L.Rev. 1212, 1213, (1955).

14. If we were to apply the *Klaxon* rule, we should look to the choice of law rules of the state in which this court sits: New York. New York has adopted a "center of gravity" or grouping of contacts theory with respect to choice of law in contract cases. *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954); *Intercontinental Planning Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). New York therefore applies the law of the jurisdiction "which has the most significant contacts with the matter in dis-

pute." *Auten v. Auten, supra*, 308 N.Y. at 160, 124 N.E.2d 99. See also *Uniroyal Inc. v. Heller*, 65 F.R.D. 83, 90 (S.D.N.Y.1974).

In the proceeding at bar, the administrative officers of both DHO Texas and DHO Ohio, at the time the lease was entered into, until the present, were and are located in New York City. The Lease and Guarantee were executed by all parties in New York City. Moreover, all payments under the Lease were made from defendants' administrative offices in New York and received by plaintiffs in New York. However, defendants' lease obligations to maintain and repair the subject premises were to be performed in Texas.

Although, clinically, New York appears to be both *lex loci contractus* (law of the place where contract was entered into) and *lex loci solutionis* (the law of the place, *inter alia*, where payment is to be made) and Texas, merely *lex loci solutionis* (the law of the place, *inter alia*, where performance of the contract is to be made), for purposes of this proceeding, Texas, the situs of the property, has the most significant contact with the matter, (*i. e.* the obligation to repair) in dispute. Accordingly, it would seem that Texas law would be applied by a New York court.

15. *Cf. Bensen v. Jackson*, 238 F.Supp. 309, 316 (E.D.Pa.1965) (diversity of citizenship case). Although defendants maintain that Texas law governs here, they generously rely on New York law in their submissions to this Court.

16. See fn. 14, *supra*.

16a. *Utica Mutual Ins. Co. v. Port Cargo Motor Lines, Inc.*, 478 F.Supp. 351, 352–3 (S.D.N.Y. 1979).

commit waste.[17] Such obligation, often clothed in the caveat to keep the leased premises "wind and water tight", is generally confined to minor or general repairs including "a duty of replacing doors and windows broken during the term, replacing a fence, restoring boards to the side of a building, and repairing a leaking roof." [18]

Of course, the parties to a lease agreement may, by an express covenant therein, enlarge a tenant's obligation with respect to repairs, alterations, or improvements of the demised premises.

Although express covenants often "are cast in a great variety of forms",[19] the effect of such covenants is governed by principles of construction anchored in applicable contract law.[20]

(2)

*"Put and Keep in Good Repair"*

Sections 6.01 and 6.02 of the subject lease, quoted in Finding 13, embodies DHO Texas' obligation to repair.[21] The lease, concededly [22] a "net-net-net lease",[23] requires, *inter alia*, that the lessee, DHO Texas:

"at all times and at its own cost and expense, put, keep, replace and maintain in thorough repair and good condition all buildings and improvements and paved areas erected on the Demised Premises, or forming a part thereof (including all building equipment which is an integral part of the building structure), both inside and outside, structural and nonstructural, extraordinary and ordinary...."

Perhaps because express covenants to repair, take "a great variety of forms" [24] neither our research, nor that of the parties' (as evidenced by their submissions), have unearthed Texas decisional law interpreting the scope of the particular contractual provision in the subject lease. Under such circumstances, however, as noted earlier, even assuming that Texas law applies, New York decisional law,[25] as well as general landlord and tenant rules, may be looked to for guidance [26] in interpreting the form of

---

**17.** 2 *Rasch, N.Y. Landlord and Tenant* § 620 at 79 (2d ed. 1971) (hereinafter "Rasch"); 35 Tex. Jur.2d *Landlord and Tenant* § 82 at 572 (1962); 1 *American Law of Property* § 3.78 at 346 (A.J. Casner ed. 1952); *Morton v. Burton-Lingo Co.*, 136 Tex. 263, 150 S.W.2d 239, 241 (1941); *Edwards v. Ollen Restaurant Corp.*, 198 Misc. 853, 98 N.Y.S.2d 815 (Mun.Ct. Kings Co.) *aff'd without opinion* 198 Misc. 858, 103 N.Y.S.2d 512 (App. Term 2d Dept. 1950). See *e. g.* 35A *N.Y. Multiple Dwelling Law* § 78 (McKinney) (statute in derogation of common law).

**18.** Draper, *Covenants to Repair*, 25 Tenn.L.Rev. 485, 487 (1958) (footnote and citation omitted).

**19.** 1 *American Law of Property, supra* § 3.79 at 349.

**20.** 49 Am.Jur.2d *Landlord and Tenant* § 141 at 167 (1970). See *e. g. Fisher v. Temco Aircraft Corp.*, 324 S.W.2d 571, 575 (Tex.Civ.App.1959); *Frank v. Kuhnreich*, 546 S.W.2d 844, 848 (Tex. Civ.App.1977).

**21.** See 35 Tex.Jur.2d *Landlord and Tenant* § 83 at 573 (1962).

**22.** Defendants' Post-trial Memorandum of Law, p. 3, n.3.

**23.** A "net-net-net lease" typically requires a lessee to pay "a monthly lump sum for rental as well as [holding him] ... responsible for all other costs and expenses arising from the prop-

erty." *H.K.H. Co. v. American Mortgage Ins. Co.*, 490 F.Supp. 1201, 1202 (D.Nev.1980). *Cf. United Stores of America Inc. v. Fireman's Fund Ins. Co.*, 420 F.2d 337, 340 (8th Cir. 1970). ("net-net lease").

Moreover, it has been noted that "Repair clauses in long term leases tend to follow a substantially similar pattern. A net lease presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance or any other charges, other than landlord's income taxes. Accordingly, the repair clause requires tenant to make all repairs, inside and out, structural and otherwise, as well as all necessary replacements of the improvements on the premises [and to comply with all legal requirements affecting these improvements during the term]. A lease is not 'net', as this term is used in long-term leases, if the tenant's repair obligations are less than these." 2 *Friedman on Leases* § 10.8 at 457 (1978) (Bracketed portion in text).

**24.** See footnote 19, *supra*.

**25.** See footnote 16a, *supra*.

**26.** *Cf. Patton v. United States*, 139 F.Supp. 279, 283 (W.D.Pa.1955) (where although federal law indisputably controlled, there was an absence of federal law on the subject). See also *Girard Trust Co. v. United States*, 149 F.2d 872, 874 (3d Cir. 1945).

contractual phrase under consideration here.

New York law, in this regard, uniformly holds that

"A covenant to keep in good repair . . . obligate[s] the tenant to put the premises in good repair if they were not so at the commencement of the term." [27]

Thus, in *Ridder v. The Mutual Paper Co., Inc.,*[28] the Court, in reversing a decision of the Municipal Court of the City of New York, pertinently found there that

"Plaintiffs sued for breach of covenants in a lease to *put* and keep the premises in good order and repairs. The defendant [lessee] argues that even in such a contract the obligation of the lease depends upon the age and character of the building and that since there was no testimony in that regard the verdict directed for the defendant was correct. It seems to us, however, that the obligation was not limited by the original condition of the premises nor by their age but was a direct and absolute obligation to put premises in good repair. *City of New York v. McCarthy,* 171 App.Div. 561, 157 N.Y.S. 711) . . . ."[29]

■■ We are, of course, not unaware that "there is a tendency of Texas courts to favor a construction that would not make

the lessee an insurer under " 'repair' and 'deliver up in good order and condition' covenants of a lease." [30] But, as just stated, the form of covenant in the subject lease imposes on the tenant a much higher obligation to repair than his mere covenant to "repair".[31] Where, as here, the provisions of the lease, *inter alia,* relating to the lessee's obligations to repair, are unambiguous,[32] and, in considering all of the material provisions of the lease agreement relating to repairs, the reasonable sense and meaning of the words employed in this type of "net" lease requires us to hold, as plaintiffs urge, that defendants are under an absolute obligation to do all that is necessary, structurally or otherwise, to put the subject premises in good repair.

### (3)
### *Measure of Damages*

■ It is well settled that "[a]n action for the breach of a tenant's covenant to keep the premises in repair may be brought either before or after the expiration of the term." [33] The measure of damages, however, differs depending upon the point in time when the action is brought. If the action is commenced before the term expires, the general rule is that "the measure of damages is the injury to the reversion" [34]

27. *Tinsley v. Smith,* 115 App.Div. 708, 712, 101 N.Y.S. 382 (2d Dept. 1906) (emphasis in text) (citation omitted). Compare *Lovejoy v. Townsend,* 25 Tex.Civ.App. 385, 61 S.W. 331, 332 (Tex.Civ.App.1901).

28. 126 Misc. 108, 212 N.Y.S. 576 (App. Term 1st Dept. 1925) (per curiam).

29. *Ibid.* See also 2 Rasch, *supra,* § 626 at 83 (cases cited); 1 *American Law of Property* § 3.79 at 349 (A.J. Casner ed. 1952); Annot., 20 A.L.R.2d 1331, 1335 (1951); 2 Walsh, *Commentaries, Law of Real Property* § 162 at 208–9 (1947).

30. 35 Tex.Jur.2d. *Landlord and Tenant* § 98 at 592 (1962).

31. *Compare* 2 Rasch, § 627 at 83–84. See *Fisher v. Temco Aircraft Corp.* 324 S.W.2d 571, 576 (Tex.Civ.App.1959) which equates, *inter alia,* the terms "to repair" and "keep in good repair."

32. Since we find the relevant provisions of the subject lease unambiguous, we need not dwell upon Texas law, which in this connection is the same as general contract law, that lease agreements are construed against the party drafting them (see Finding of Fact 4) and that such ". . . rule appears to be even stronger when the draftor attempts to exempt himself from liability. . . ." *Freight Terminals, Inc. v. Ryder System, Inc.,* 326 F.Supp. 881, 889 (S.D.Tex.1971), *aff'd* 461 F.2d 1046 (5th Cir. 1972) (applying Texas law) (citations omitted).

33. *City of New York v. Pennsylvania R. Co.,* 37 N.Y.2d 298, 301, 372 N.Y.S.2d 56, 333 N.E.2d 361 (1975). See also *City Hotel Co. v. Aumont Hotel Co.,* 107 S.W.2d 1094, 1095 (Tex.Civ.App. 1937).

34. 2 Rasch, *Landlord and Tenant* § 634 at 90 (1950). *See* also *Tobin v. Union News Co., infra,* fn. 65; *Glickman v. DeBerry,* 11 S.W.2d 367 (Tex.Civ.App.1928); *Fagan v. Witcomb,* 4 Willson Civ.Cas.Ct.App. § 27, 14 S.W. 1018, 1019 (Tex.1889).

(*i. e.* the difference between the value of the premises with and without the repairs); if suit is commenced subsequent to the expiration of the term, damages are generally measured by the cost of the repairs.[35]

The stated rationale for the damage to the reversion rule is that the landlord is not obligated to spend money on repairs[36] and that allowance of the present cost of repairs would give him an improved property significantly prior in time to the term's expiration.[37] Simply put, this rule is applied "to avoid windfall recoveries"[38] particularly in cases where the costs of repair or improvements may be unrelated to the landlord's actual damages.[39] Thus, if the " 'cost of repair' rule [applicable to post lease expiration cases] will give lessors a greater benefit than could be gained for full performance, a different measure [the damage to reversion rule] must be applied to avoid injustice...."[40]

■■ There are, however cases which, under special circumstances, permit lessors, prior to the expiration of the lease term, to recover the cost of repairs in an action for breach of a tenant's obligation to repair. Thus, for example, if the lease specifically provides that the lessee will, in the event of damage, immediately repair the injury to the property, courts allow, even prior to the expiration of the term, the costs of repair.[41] In our view, the exception to the general rule enunciated earlier, is applicable to the proceeding at bar since, by the specific terms of the subject lease the tenant was obligated "... *at all times* [to] ... put, keep, replace and maintain all personal property and equipment to or used in connection with the Demised Premises in full operating condition."[42] Moreover, the evidence here reveals that the lessee for the last three to five years has not "acted to overcome the disrepair"[43] of the premises and the likelihood of such continued state is substantial.[44] This, coupled with other factors requiring termination of the lease,[45] *infra*, convinces us that the proper measure of damages here is the actual costs of repair. Since these repair costs were incurred during a Chapter XI proceeding, they are an administration expense,[46] and accordingly, the consolidated debtors must deposit, with the disbursing agent, the sum of $1,197,772.20 to be disbursed to plaintiffs in the event of the confirmation of this Chapter XI case.[47]

---

**35.** See *e. g. Clark and Johnson v. Hamilton,* 16 S.W.2d 833 (Tex.Civ.App.1929). But see, Annot., 80 A.L.R.2d 983, 1017–18 (1961), which indicates that Texas follows the general rule of damages applicable to suits commenced subsequent to the expiration of the terms as set forth in the text of this opinion, *except* where the lease covenant merely obligates the lessee to return the leased premises, at the expiration of the term, in the same or similar condition as when received. Under such a lease obligation, which is not the case here, the measure of damages is the difference in value between the condition of the leased premises at the commencement of the term and the condition of the premises at the expiration of the term.

**36.** *Middendorf v. Fuqua Industries, Inc.,* 623 F.2d 13, 19 (6th Cir. 1980).

**37.** Annot., 80 A.L.R.2d 983 at 987 (1961).

**38.** *Missouri Baptist Hospital v. United States,* 555 F.2d 290, 294 (Ct.Cl.1977).

**39.** *Pennsylvania Cement Co. v. Bradley Contracting Co.,* 11 F.2d 687, 688 (2d Cir. 1926).

**40.** *Bowes v. Saks and Company,* 397 F.2d 113, 117 (7th Cir. 1968) (per curiam).

**41.** See *e. g. The Container Co. v. United States,* 90 F.Supp. 689, 691–2 (Ct.Cl.1950).

**42.** Section 6.02 of the subject lease (emphasis supplied). See Finding 13, *supra. Compare with In re Mount Holly Paper Co.,* 110 F.2d 220, 223 (3d Cir. 1940) where the lease provisions did not specify any time during the term for performance of repairs.

**43.** *Compare Corbett v. Deamon Shoe Co.,* 338 Mass. 405, 155 N.E.2d 423.

**44.** See *infra* fn. 57.

**45.** *Compare Pennsylvania Cement Co. v. Bradley Contracting Co., supra* at 688.

**46.** *In re Arbycraft Co.,* 288 F.2d 553, 557 (3d Cir. 1961).

**47.** See 11 U.S.C. § 367 (repealed); Bankruptcy Rule 11–38(a)(2), 415 U.S. 1028, 94 S.Ct. 3251, 39 L.Ed.2d xlviii.

### (4)
#### Plaintiffs' Evidence of Breach

The plaintiffs presented three expert witnesses to sustain their burden[48] that the defendant DHO Texas, in fact, breached its lease obligations to repair: Wayne R. Hamilton, a licensed architect in Houston, Texas since 1950; John L. Bridges, a moisture protection consultant in the Houston area since 1956; and Donald E. Hawkins, a rehabilitation costs consultant and general contractor engaged in the construction business in Houston for approximately 25 years. Hamilton visited the subject premises on several occasions between December 17, 1980 and March 18, 1981;[49] Bridges inspected the roofs of the subject premises[50] once on February 24, 1981 and twice in March 1981; Hawkins, assisted by members of his staff, inspected the subject premises on February 24 and 25 and March 17 and 18, 1981.

In connection with the testimony of these three witnesses, 183 photographs and 49 slides, *inter alia*, were introduced and admitted into evidence.

Their testimony, including the photographic evidence, reveals that during a period of three to five years to the present, pervasive damage to the roof assemblies and roof decks has taken place in all four buildings comprising the warehouses on the subject premises. The deteriorating condition of the roof assemblies, according to plaintiffs' expert testimony, has permitted seepage of water and moisture into the supporting roof decks whose top sides and undersides are covered with varying degrees of rust. Moreover, these rusted roof decks weaken the roof assemblies resulting in a 2 inch deflection, excessive, according to accepted construction standards. The plaintiffs' experts testified that both the roof assemblies and roof decks, must be replaced.[51] A further and necessary result of the lack of moisture protection in the roof assemblies and decks is that water and moisture have freely flowed through the walls. Additionally, large portions of the outer walls of the warehouse buildings evidence loose blocks, and there are holes and cracks, as well, in the exterior walls. The deteriorated condition of these exterior walls, and Dur-o-Wal reinforcement rods has additionally contributed, according to plaintiffs' expert, to the presence of moisture in the interior walls of the buildings. Without repair and replacement work, they say, there will be irreparable damage to the structural integrity of the buildings.

Plaintiffs' experts have further presented evidence to this Court that there has been serious and extensive damage to the floor slabs in three of the warehouse buildings. They have testified that such damage is directly attributable to free water washing out the fill under the floor slabs which has entered the buildings via the roofs and the exterior of the perimeter walls. These conditions, according to these witnesses, as in the case of the roof assemblies and roof decks, have been building up for a period of three to five years.

The enormous amounts of moisture within the warehouse structures, and seeping in from both the roof and the exterior walls, due to improper maintenance and repair,

---

**48.** See 51C C.J.S. *Landlord & Tenant* § 373(3)a at 991 (1968); 49 Am.Jur.2d § 978 at 950 (1970). However, "[t]he rule is that the burden is on the tenant who has covenanted to make repairs to show that particular repairs were within an exception to the covenants...." *Edwards v. Ollen Restaurant Corp.*, 198 Misc. 853, 857, 98 N.Y.S.2d 815 (Mun.Ct.Kings Co.) *aff'd without opinion*, 198 Misc. 858, 103 N.Y.S.2d 512 (1950).

**49.** The trial of this adversary proceeding commenced on March 23, 1981.

**50.** Personal inspection of the roofs was made on Buildings 2 and 4 while inspection of the roofs of Buildings 1 and 3, approximately 40 feet from Buildings 2 and 4 was made with field glasses, owing to their inability to gain access to the roofs of Buildings 1 and 3.

**51.** Plaintiffs' experts testified that the existing 22″-gauge steel deck should be replaced, in each building, by an 18″-gauge deck since a 22″-gauge steel deck was not adequate to support the roof assemblies of the warehouse buildings. The additional cost of an 18″-gauge deck for all four buildings was estimated to cost $41,000.

further resulted in rusted doors, gutters, and downspouts throughout the buildings. Defendant DHO Texas' lack of maintenance and repair, according to plaintiffs' experts, similarly accounts for the woeful condition of the grounds surrounding the warehouses, the railroad sidings and truck loading and parking areas.

(4)

*Defendants' Evidence as to Breach*

Defendants presented two expert witnesses on the trial of the adversary proceeding: Ervin Grafe, a consulting and licensed engineer engaged in the Houston, Texas area for about 18 years;[52] and O.B. Spence, a construction manager with close to 20 years experience in that field.[53] Grafe inspected the demised premises for approximately three hours on one occasion on the morning of March 20, 1981. Following the construction of the warehouse on the subject premises, Spence visited the premises in July, 1980 and thereafter on eight occasions.[54]

Mr. Grafe, whose live testimony was accompanied by twelve photographs taken by him,[55] stated that the maximum possible deflection of a roof resting above a deck, similar to those at bar, was less than ½ inch and that rusting of the deck would increase deflection by no more than 10%. Mr. Grafe testified, further, that the several small holes he had seen in the steel deck could be repaired by replacing individual sections of the deck, without the necessity for replacing the entire deck of each of the warehouse buildings.[56]

Mr. Spence, testifying with respect to the conditions of the roof, stated that during his visits to the premises he observed several repair patches on the roof and spudding of the roof.[57]

With respect to the interior walls Mr. Grafe, who admittedly stated on the stand that he didn't "know that much about air temperatures and moisture . . . [since] it [was] not . . . [his] field of expertise", testified that moisture in the interior walls would have virtually no effect on the capac-

---

**52.** Mr. Grafe was a "surprise" witness substituted by defendants, at trial, for one Paul Kornman, Jr., who was listed in the pre-trial order. Clearly, "where a party springs a surprise witness on his adversary in defiance of the terms of a pre-trial order . . . and the circumstances indicate bad faith and an intent to take some unfair advantage, the trial judge . . . has ample power to deal with the situation." *Clark v. Pennsylvania Railroad Co.*, 328 F.2d 591, 594 (2d Cir.), *cert. denied*, 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964). However, on the record made before this Court, in the knowledge that we should not exact a "slavish adherence to the witness list", *United States v. International Business Machines*, 87 F.R.D. 411, 416 (S.D.N.Y.1980) and "to prevent manifest injustice", Fed.R.Civ.P. 16, this Court permitted defendants' substitute expert witness to testify.

**53.** Mr. Spence was formerly employed by Overmyer during the period 1965–7 during which period Spence was involved in the construction of some 140 warehouses out of the 180 warehouses built by Overmyer " 'in three years . . . in thirty states.' " *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 179, 92 S.Ct. 775, 779, 31 L.Ed.2d 124 (1972). Moreover, the record of this adversary proceeding reveals that Mr. Spence was retained, in July 1980, as a construction manager for D. H. Overmyer Company and that, at present, 20 percent of his work is for the Overmyer companies.

**54.** It appears that Mr. Spence's last inspection of the premises was in January, 1981. The witness' other inspections, since July 1980, took place in August and September of 1980.

**55.** In my view, if these photographs did not buttress plaintiffs' contentions directed to the condition of the premises, they clearly did not belie them.

**56.** Moreover, Mr. Grafe stated that the load bearing capacity of the existing 22-gauge steel deck was more than adequate to support the roof assembly.

**57.** In one of the documents introduced by defendants there is an admission that "Abel Roofing was the only contractor who would go along with patching. The other contractors felt the roof problem was beyond the patching stage due to the extent of the leaks." In this connection, it is noteworthy, that Mr. Bridges, plaintiffs' moisture protection consultant, who, as noted earlier, has plied his trade for 25 years in the Houston area, testified that Abel Roofing was referred to as "gypsies"—a group including 2 brothers from Florida, one young man from Illinois and two others who were not identified. They "repaired" roofs whenever a job happened to surface.

ity of the walls to carry loads. Turning to the exterior walls of the warehouse structures Mr. Spence testified that the affected areas required no more than scraping and wire brushing.

Defendants' evidence, with respect to the dropped sections of the interior floors, was directed, in great part, to their version of the cause and effect of such condition, rather than the fact of the condition itself.[58] Defendants' expert witnesses additionally testified, in contradiction to plaintiffs' experts, that in order to repair these floor slabs, it would not be necessary to saw cut the slab at the fracture point or to insert dowels into the good portion of the concrete.

### (5)

### *Cost of Repairs*

There is, in my view, ample proof that defendants' duty under the lease, to keep and put in repair, was breached in the particulars set out in the Finding of Fact 21, *supra*. As to certain items, claimed by the plaintiffs, which are not allowed, plaintiffs have failed to meet their burden as to the necessity of the repair under the lease or the cost thereof.

In particular, as noted earlier, plaintiffs contend that the existing 22 inch-gauge

steel deck should be "replaced", in each building, by an 18 inch-gauge deck at a total additional cost of approximately $41,-000. Although we agree, on the basis of the testimony, that the existing steel deck should be replaced, we are not convinced that an 18 inch-gauge deck, is required, under the circumstances here, in the stead of a new 22 inch-gauge deck. Accordingly, we have disallowed the $41,000 requested repair and allocated its reduction from that item of repairs submitted by plaintiffs' rehabilitation expert, Mr. Hawkins.[59]

Further, on the evidence, we have reduced plaintiffs' rehabilitation cost estimate for neutralizing the rust of structural steel other than the steel deck in each building by 50%[60] water proofing of the cement masonry unit walls by 25%[61], the painting of all exterior metal overhead doors and dock bumpers by 25%[62] and the purchase and installation of new gutters and downspouts by a total of $15,000[62a]. Moreover, we have, based upon the evidence, determined that in repairing the structural floor slabs there is no necessity, as plaintiffs maintain, either to saw cut the slab at the fracture point or to insert dowels into the good portion of the concrete. We have, accordingly, reduced and adjusted plaintiffs' repair claims for such items.[63]

---

**58.** In similar style, defendants concede damage to the site surrounding the warehouse and to the railroad siding tracks. But despite their lease obligations, they argue, respectively, that the warehouse complex is utilized by heavy duty trucks and that the railroad tracks are not being used by any of the "tenants". (With respect to the "tenants", see Findings 9 and 10, *supra*).

**59.** The total square footage of the warehouse premises amounts to 240,900 square feet. Using Hawkins' approximate figure of $41,000, we arrive at a cost of 17 cents per square foot for the disallowed 18 inch-gauge deck. Utilizing 17 cents per square foot, we apportioned and adjusted the costs of this repair downward. See Findings 21A(c); 21B(c); 21C(c) and 21D(c) *supra*.

**60.** See Findings 21:A(b); B(b); C(b) and D(b), *supra*.

**61.** See Findings 21:A(f); B(f); C(f) and D(f), *supra*.

**62.** See Findings 21:A(k); B(k); C(k) and D(j), *supra*.

**62a.** See Findings 21:A(d); B(d); C(d); D(d), *supra*. Our view is that plaintiffs' testimony as to the extent of the deterioration of the gutters and downspouts was somewhat exaggerated. Accordingly, the cost estimates as to Buildings 1 and 2 were reduced by $5,000 each, and Buildings 3 and 4, by $2,500 each.

**63.** See Findings 21:A(g); B(g); and C(g), *supra*. Plaintiffs' exhibit 15 in evidence entitled "Rehabilitation Cost Estimate for Overmyer Warehouses at Seamist and Overmyer Drives, Houston, Texas", consists of seven typed and nine handwritten pages. Page 4 of the handwritten pages is headed "Repair to Stru [sic] Floor Slabs." Mr. Hawkins, who prepared this document, arrived at a cost of $4.60 per square foot by arriving at a dollar sum of the items to be utilized in such repairs and divided that sum ($966) by 210 square feet (the affected footage of warehouse # 1) resulting in $4.60 per square foot for the cost of repair of the floor

Plaintiffs' proof with respect to the cost of repair rests upon the testimony of their expert, Donald E. Hawkins, who as earlier noted, is a rehabilitation cost consultant and general contractor engaged in the business of construction in Houston for approximately 25 years. Mr. Hawkins testified, and was cross-examined, at considerable length, with respect to the manner in which he calculated the cost of repairs required. Defendants' expert witness, O. B. Spence, it appears, utilized the same basic cost estimate approach as plaintiffs' counterpart expert, Hawkins. After having had an opportunity to see and hear these two witnesses, we are convinced that Mr. Hawkins' testimony was the more credible, disinterested [64] and well-founded.

We must emphasize that neither Hawkins' calculations of the cost of items to be repaired, nor our computations finding some of Hawkins' figures excessive, are unerringly precise. The applicable rule of

law, in this regard, however, is that where there exists a reasonable basis for the cost of repairs and where, as here, the best proof possible has been adduced, such costs need not "be calculated with absolute exactness." [65]

Thus, in our opinion, both the testimony of Hawkins, as well as his worksheets, which were entered into evidence, afford except as otherwise noted, a reasonable basis for the cost of repairs set forth in our Finding of Fact 21, supra.

## C

### TERMINATION OF THE LEASE

■ In addition to their request for damages, which we have found to amount to the cost of repair to the subject premises, plaintiffs seek to terminate their relationship with DHO (Texas), for stated defaults, under the applicable provisions of the lease.[66]

---

slabs. Hawkins then applied this $4.60 per square foot to the affected footage of warehouse Buildings 1, 2 and 3 to arrive at his cost estimates for such repairs (no such damage was found in Building # 4). This Court, on the basis of its review of the evidence, excised from the $966 figure set forth above: $62 for saw cutting; $7 for dowel steel; and $20 drilling for dowel; arriving at a figure of $877 ($966 − $89 = $877). We then divided $877 by 210 square feet and arrived at a new square foot price for the floor slab repairs, i. e. $4.17. Multiplying $4.17 by the square footage of the affected buildings, we reduced the estimated cost of such repairs as reflected in the Findings set forth supra.

**64.** See footnote 53, supra.

**65.** Cf. Eastman Co. v. Southern Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927) (damages in an action commenced under the Sherman Anti-Trust Act). See also Freight Terminals Inc. v. Ryder Systems, Inc., 461 F.2d 1046, 1053 (5th Cir. 1972) (applying Texas law); Tobin v. Union News Co., 18 A.D.2d 243, 245–6, 239 N.Y.S.2d 22 (4th Dept. 1963), aff'd 13 N.Y.2d 1155, 247 N.Y.S.2d 385, 196 N.E.2d 735 (1964).

**66.** See Finding 14, supra.

The defendants devote a substantial portion of their post-trial memorandum of law arguing that plaintiffs may not seek termination of the subject lease since the latter failed to provide defendants with notice of default in the manner prescribed by the lease. It is significant, how-

ever, that defendants neither pleaded such alleged notice requirement by affirmative defense in their answer to plaintiffs' complaint (see Fed.R.Civ.P. 8[c]; Compare 125 Skillman Ave. v. American Home Assurance Co., 103 Misc.2d 284, 425 N.Y.S.2d 716, 718 [N.Y.Civ.Ct. Kings Co. 1980]) nor did they preserve such ground in the pre-trial order (see Bettes v. Stonewall Ins. Co., 480 F.2d 92, 93–4 [5th Cir. 1973] [applying Texas law]). Rather, on the very last day of trial, defendants sought to raise the question of notice to which plaintiffs objected, and which objection was sustained by the Court. Although, as noted in another connection, (see footnote 52, supra the Court, in order to "prevent manifest injustice" may modify a pre-trial order (Fed.R.Civ.P. 16), any injustice, and we discern none here, resulting from our exclusion of the issue of notice, comes from defendants' own failure to timely present such ground either in its answer filed on January 12, 1981 or in the pre-trial order of March 20, 1981. Compare Colvin v. United States for Use & Benefit of Magini Leasing and Contracting, 549 F.2d 1338, 1340–1 (9th Cir. 1977). See also Ely v. Reading Co., 424 F.2d 758, 763–4 (3d Cir. 1970). Accordingly, in our discretion, we do not consider such belated defense.

Even assuming, however, that defendants could properly raise their claim that plaintiffs failed to give requisite notice of the defaults asserted here, such claim is without merit. We have found that plaintiffs gave written notice to defendants of the latter's default in the untimely payment of the September 1980 rent. (See Finding 17, supra). Moreover, by letter

In particular, the lease quite specifically enumerates three separate grounds constituting an event of default: (1) failure to timely pay rent; (2) failure by the lessee to observe or perform any of its obligations under the terms of the lease; and (3) the lessee's filing, *inter alia*, for an arrangement under the Bankruptcy Act.

The question necessarily arises as to whether the lease obligations just set forth, are: (1) covenants, the breach of which may be recompensed by damages or remedied by specific performance [67] or (2) conditions (or conditions subsequent), the breach of which may, at the lessor's election, terminate or forfeit the estate [68]; or (3) conditional limitations, the breach of which, without more, automatically terminates the leasehold.[69]

This Court, which has been described as a tribunal of equity,[70] is particularly sensitive to the universally accepted proposition of jurisprudence that "equity does not favor any forfeiture." [71] Thus it has been observed that

"Conditions subsequent are not favored by the courts, and the promise or obligation of the grantee will be construed as a covenant unless an intention to create a conditional estate is clearly and unequivocally revealed by the language of the instrument. In cases where the intention is doubtful, the stipulation is treated as a covenant rather than a condition subsequent with the right to defeat the conveyance." [72]

■ However, where, as here, the intention to create a conditional estate is clear from the terms of the lease agreement, we are counseled that equity "does not license judicial eradication of rights ... clearly vested by the contracting parties as part of their bargain." [73] This is particularly apt here where the party seeking to avoid forfeiture, itself drafted the lease agreement [74] which includes the description of the default provisions therein as "Conditional Limitations".[75]

---

received on September 30, 1980 by defendants, the plaintiffs advised defendants of repairs needed to the roofs of the warehouse structures (see Finding 23, *supra* ). Although such notice related solely to the condition of the roof; "[i]t seems doubtful, under the circumstances, whether any more specific notice or demand would have been fruitful. Where a demand before suit would avail nothing, commencing suit is a sufficient demand...." *Puget Investment Co. v. Wenck*, 36 Wash.2d 817, 221 P.2d 459, 467 (1950).

Finally, since the subject premises are in the custody of this Court and under its summary jurisdiction, plaintiffs could not on their own properly require defendants to surrender the premises as contemplated by the applicable lease provisions. See *Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658, 660 (2d Cir. 1940).

**67.** 2 Rasch, *New York Landlord & Tenant Law* § 729 at 182 (2d ed. 1971); *Johnson v. Gurley*, 52 Tex. 222, 226 (1879).

**68.** Rasch, § 730 at 183; *Johnson v. Gurley*, *supra* at 227.

**69.** Rasch, § 743 at 191; *Johnson v. Gurley*, *supra* at 227.

**70.** *Securities and Exchange Commission v. U. S. Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1950).

On other occasions, this Court has been described as "a virtual court of equity", *Continental Bank v. Rock Island Ry. Co.*, 294 U.S. 648, 676, 55 S.Ct. 595, 606, 79 L.Ed. 1110 (1935) or one which applies equitable principles. See *In re Lane Foods, Inc.*, 213 F.Supp. 133, 135 (S.D. N.Y.1963) (Weinfeld, J.).

**71.** *Zimmer v. Wells Management Corporation*, 348 F.Supp. 540, 542 (S.D.N.Y.1972). It has recently been observed that "the term 'forfeiture' normally connotes a total loss in consequences of some event." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 372, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980).

**72.** *Hearne v. Bradshaw*, 158 Tex. 453, 312 S.W.2d 948, 951 (1958).

**73.** *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 844 (2d Cir. 1975).

**74.** *Compare Sirtex Oil Industries, Inc. v. Erigan*, 403 S.W.2d 784, 788 (Tex.1966).

**75.** Lease, Article XV, P. 14, annexed to plaintiffs' complaint as Exhibit "A" and admitted into evidence on the trial of this proceeding as Plaintiffs' Exhibit 16.

Only in an egregious case will equity interfere to afford relief to the lessee from a condition subsequent.[76] Thus,

> "[a]bsent overriding equitable considerations a bankruptcy judge in a . . . Chapter XI proceeding is charged with enforcing valid lease termination against debtors still in possession not only in the § 70b situation [*i. e.*, § 70b of the Bankruptcy Act of 1898] of bankruptcy termination clause but also when termination [as here] is based on other lease provisions having nothing to do with bankruptcy. . . ."[77]

With these general principles in mind, we now turn to the three default provisions set out at the beginning of this section and to plaintiffs' contentions that these provisions require termination of the subject leasehold.

### (a)
### Defaults in Rent Payments

■ We have found that defendants ultimately paid their rent, without interest, for the months of September, November, and December 1980.[78] Although we read defendants' obligation to timely pay rent, under the specific language of the subject lease, as a condition, rather than as a mere covenant,[79] where the delay in rent payments have been, in the main insubstantial, and the loss to the lessors relatively insignificant, it would be both inequitable and unconscionable to literally enforce the lease condition, in this regard, to permit forfeiture on that basis alone.[80]

### (b)
### Defaults in Repair Obligations

■ We have just noted that the defendants inserted in their own form lease here, the description of lease defaults as "Conditional Limitations". Yet, despite this unambiguous representation of the default provisions, defendants would have this Court read their defaults, with respect to repair obligations, as a condition which was converted, they say, into a mere covenant when plaintiffs allegedly failed to provide proper notice of the repair defaults. Since we have earlier disposed of defendants' arguments addressed to the notice requirements of the lease,[81] no such conversion to a covenant can be justifiably countenanced or recognized.

Whether we view the lessees' repair defaults as a condition subsequent triggered by the commencement of this proceeding,[82] or as a conditional limitation authorizing an *ipso facto* lease termination, even from the charitable perspective of a chancellor in equity, we can discern no equitable basis or consideration to relieve defendants of the consequences of their defaults. We have set forth earlier, with sufficient particularity, the extent, substantiality and materiality of defendants' breach of their repair obligations under the subject lease. Moreover, we have noted defendants' cavalier, haphazard, and patchwork attempts to repair the premises in order to avoid the inevitable termination of their leasehold. Equity, under these circumstances, will not intervene to avoid forfeiture.

**76.** *Sirtex Oil Industries, Inc. v. Erigan, supra* at 788.

**77.** *In re D. H. Overmyer Co., Inc.*, 510 F.2d 329, 333 n.2 (2d Cir. 1975) (citations omitted).

**78.** See Findings 16, 19 and 20, *supra*, respectively.

**79.** Defendants take no position, in their submissions, as to the classification of the default provisions relating to rent. Rather they unashamedly maintain, without any basis, that they have not violated either their lease obligations or their obligations, in this respect, under an order of this Court. See Finding 15, *supra*.

**80.** *Compare Sirtex Oil Industries, Inc. v. Erigan, supra* at 788. This analysis, of course, does not relieve the defendants of their obligation to pay any and all accrued rental payments as well as interest due and owing to plaintiffs for late rent payments.

**81.** See footnote 66, *supra*.

**82.** See footnote 66, *supra citing Puget Investment Co. v. Wenck, supra.*

### (C)
### Bankruptcy Termination Clause

We have found[83] that by stipulation entered into between plaintiffs' predecessor in interest and Overmyer, which was "So Ordered" by this Court, the former agreed not to consider defendants' Chapter XI filing an event of default under the lease, *provided* that defendants perform all of their other lease obligations. Since we have determined that defendants have indeed not fulfilled their lease obligations to timely pay rent and to repair the subject premises, plaintiff may properly invoke the bankruptcy termination clause, a conditional limitation,[84] as an additional basis to terminate its relationship with defendants.[85]

We have observed earlier that courts do not favor lease forfeitures or terminations. Thus, despite the clear and unequivocal language of § 70(b) of the Bankruptcy Act of 1898, specifically authorizing the enforcement, by this Court, of bankruptcy termination clauses,[86] courts have accorded to debtors, under appropriate circumstances, avenues for relief from such forfeiture clauses in Chapters X and XI cases under the 1898 Bankruptcy Act.[87]

In particular, where the courts have found that the enforcement of such termination provisions would frustrate or doom an otherwise assured Chapter XI arrangement, by removing, for example, the sole or most valuable asset from the debtor, and where the continuation of the lease would not discernably prejudice the landlord, forfeiture of the lease has not been permitted.[88]

The facts of this proceeding, however, reveal a continuous and pervasive disregard, over the years, by these defendants, of their lease obligations to their landlord.[89] Moreover, there is no basis, in the record, to assume, let alone conclude, that the subject leasehold is a valuable asset of the debtor[90] upon which a successful Chapter XI case depends.

We hold, accordingly, for all the reasons set forth above, that plaintiffs are entitled

---

83. Finding 11, *supra.*

84. *Murray Realty Co. v. Regal Shoe Co.,* 265 N.Y. 332, 335, 193 N.E. 164 (1934).

85. Indisputably § 70(b) of the Bankruptcy Act of 1898, 11 U.S.C. § 110 (repealed) which recognizes, *inter alia*, the enforceability of bankruptcy termination clauses, and which is applicable to Chapter XI cases, *Queens Boulevard Wine & Liquor Corp. v. Blum,* 503 F.2d 202, 204 (2d Cir. 1974), governs this adversary proceeding. See § 403(a) of the Bankruptcy Reform Act of 1978; *In re Parr,* 3 B.R. 691, 692 (D.C.E.D.N.Y.1979). On the basis of this analysis, we are not deterred in applying § 70 here, despite the specific interdiction against the enforcement of a bankruptcy termination clause under the terms of the Bankruptcy Reform Act of 1978. See 11 U.S.C. § 365(e)(1)(B).

86. See *Finn v. Meighan,* 325 U.S. 300, 303, 65 S.Ct. 1147, 1149, 89 L.Ed. 1624 (1945). (Chapter X case).

87. See *e. g. In re Fleetwood Motel Corp.,* 335 F.2d 857 (3d Cir. 1964) (Chapter X case); *Queens Boulevard Wine & Liquor Corp. v. Blum, supra,* (hereafter "Queens Blvd.").

88. *Queens Blvd., supra* at 206–7.

89. *In re D. H. Overmyer Co., Inc., supra* at 322.

90. It has been observed that the business of Overmyer involves sale and leaseback transactions by which Overmyer contracts warehouses, sells them to investors then leases back the premises for eventual sublease to actual users. The subleases between Overmyer and its tenants are for a higher rental than Overmyer pays to the landlord. See *In re D. H. Overmyer Co., Inc., supra* at 331. In this proceeding, we have found that two of the warehouses on the subject premises have been vacant since January 1, 1981 and November 1980, respectively (See Finding 9, *supra*). Moreover, the other two warehouses are leased from defendant D.H.O. (Texas) by J. C. Penney, Inc., with a termination date of August 31, 1981 (See Finding 10, *supra*). The record, therefore, hardly portrays a valuable leasehold held by this Chapter XI debtor justifying avoidance of the termination clause.

to an order terminating their lease with defendant D.H.O. (Texas) and returning the plaintiffs to possession.

### C

*Plaintiffs' Attorneys' and Experts' Fees and Disbursements*

 Defendants, by several of the provisions of the subject lease drafted by them, have obligated themselves to pay attorneys and experts fees and disbursements incurred by the plaintiffs in this adversary proceeding.[91] It is well-established that such items may be allowed by agreement of the parties[92] and this Court will enforce such obligations.

## IV

### CONCLUSION OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this adversary proceeding pursuant to Section 311 of the Bankruptcy Act of 1898, 11 U.S.C. § 711 (repealed) which is applicable to this proceeding.

2. Plaintiffs are entitled to the sum of $1,197.722.20 as an administration expense of this Chapter XI case for repairs and replacements required by the subject lease.

3. Plaintiffs are entitled to immediate payment of all outstanding rent obligations as well as interest accrued on late payments of rent.

4. The subject lease is terminated and plaintiffs are entitled to immediate possession of the leasehold.

5. Upon proper application therefor, the plaintiffs are entitled to their costs and disbursements of this adversary proceeding, including attorneys' and experts' fees and disbursements.

91. Lease, Sections 5.01, 15.04 and 15.08 annexed as exhibit "A" to plaintiffs' complaint and admitted into evidence as exhibit 16.

92. Annot. 77 A.L.R.2d 735, 737 (1961). See e. g., *379 Madison Avenue, Inc. v. Stuyvesant Co.,*

### VII

The parties are directed to settle an order on five (5) days notice in conformity with this decision.

242 App.Div. 567, 275 N.Y.S.2d 953 (1st Dept. 1934), *aff'd* 268 N.Y. 577 (1935); *Ingram v. Texas Christian University,* 196 S.W. 608, 613 (Tex.Civ.App.1917).